WARREN BROS. CO. v. CITY OF MONTGOMERY et al.

(Circuit Court, M. D. Alabama, N. D. August 9, 1909.)

1. PATENTS (§ 297*)—SUITS FOR INFRINGEMENT—EFFECT OF PRIOR DECISIONS.
   On an application for a preliminary injunction to restrain infringement of a patent, a decision of a superior or co-ordinate court of another territorial jurisdiction sustaining the validity of the patent on a final hearing, in the absence of contrary decisions, will be treated as almost conclusive, and will be followed, unless new evidence of a decisive character is presented.
   [Ed. Note.—For other cases, see Patents, Cent. Dig. § 484; Dec. Dig. § 297.*]

2. ABATEMENT AND REVIVAL (§ 10*)—SUITS FOR INFRINGEMENT—PENDENCY OF PRIOR SUIT.
   The pendency of a suit for infringement of a patent in one district does not preclude the complainant from instituting a suit in another district against the same defendant and another, not a party to the first suit, to enjoin an infringement therein; but in the later suit the court will only consider and adjudicate upon alleged infringements within its own district.
   [Ed. Note.—For other cases, see Abatement and Revival, Cent. Dig. § 86; Dec. Dig. § 10.*]

3. PATENTS (§ 300*)—SUITS FOR INFRINGEMENT—EQUITY JURISDICTION.
   The fact that the owner of a patent has established a royalty for its use by licensees does not deprive a court of equity of jurisdiction to enjoin its infringement.
   [Ed. Note.—For other cases, see Patents, Cent. Dig. § 480; Dec. Dig. § 300.*
   Jurisdiction of federal courts in suits relating to patents, see note to Bailey v. Mosher, 11 C. C. A. 313.]

4. PATENTS (§ 328*)—VALIDITY—INFRINGEMENT—STREET PAVEMENT.
   The Warren patent, No. 727,505, for an improvement in street pavements, held valid, on a motion for preliminary injunction to restrain threatened infringement, and an injunction granted, subject to the right accorded defendants to prevent its issuance by giving bond.
   [Ed. Note.—For other cases, see Patents, Dec. Dig. § 328.*]

5. EQUITY (§ 3*)—JURISDICTION—IRREPARABLE INJURY.
   Irreparable injury, in such a sense as to create a standing in a court of equity, does not necessarily mean that complainant will be ruined or grievously harmed if the court of equity does not intervene, but only that some legal right of complainant will be illegally taken from it, which in equity and good conscience it is entitled to enforce, the proper and full enjoyment of which will be impaired or lost if equity declines to interfere and puts complainant to its action at law for damages.
   [Ed. Note.—For other cases, see Equity, Dec. Dig. § 3.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

In Equity.

See, also, 166 Fed. 309.

The bill in this case is filed by Warren Bros. Company, the owners of letters patent No. 727,505, issued to J. F. Warren, to prevent infringement of a new and useful improvement in street pavements. The defendants are the city of Montgomery and the Metropolitan Engineering & Construction Company, to whom the former let the paving of a part of one of the streets in the city of Montgomery. It is claimed that, if the specifications for the work are followed, it will necessarily result in the infringement of the patent. The case is now submitted on motion for a preliminary injunction upon sworn bill, the record of the litigation concerning this patent in the Circuit Court of Appeals for the Sixth Circuit, the record of a similar suit for the Eastern District of Illinois, and upon numerous affidavits. In Warren Bros. Company v. City of Owosso (C. C. A.) 166 Fed. 309, the invention, claimed under the patent, is thus described:

"The invention relates to an improvement in that class of street pavements, consisting of a foundation of mineral matter and a top surfacing, or wearing surface, made of graded mineral matter intimately associated and united by means of asphalt or coal tar. The inventor claims as his discovery that the best condition of this top or surface of a mineral roadbed is that this top or wearing surface of such pavements 'must be made as dense, as free from voids, as possible, and also stable and nonliable to displacement.' Under the art, as practiced theretofore, the inventor says that the mineral matter united by plastic material has generally been fine gravel or sand or broken stone, not exceeding pieces of stone or other ground material above one-tenth of an inch in diameter; that the smallest percentage of voids under that method was 21 per cent. of the aggregate. He declares that to secure stability there must be a departure from this method, and that by the employment of larger-sized pieces, 'say up to those which will pass through a two-inch ring, and employing with these larger grains proper quantities of the smaller sizes down to an impalpable powder, it is possible to reduce the voids of the mineral base below 10 per cent. of its bulk.' Such an assemblage, he says, 'compacted together, will form a dense, solid, homogeneous, compact body, with the smallest percentage of voids, and possessing the highest degree of stability, and one in which the largest and smallest pieces are associated with each other indiscriminately throughout the structure, and one which, because of the sizes of the pieces and their arrangement with respect to each other, offers the smallest areas of surface for the attachment of the plastic composition to them, so that not only is a superior binding effected, or union obtained, by the plastic composition, but a smaller quantity of it is necessary for the purpose of obtaining the superior result or product.' The specifications lay stress upon the fact that the stone components of different sizes are not to be used in layers of corresponding sizes, but mixed together, the large, the small, and the dust in one aggregate, with the asphalt or other plastic composition permeating the whole mass and uniting the particles by filling in the voids and making a solid surface. This composition is spread uniformly over the top of a roadbed foundation, preferably a macadam, and is intended to form only the top or wearing surface of such a roadbed. This top section, he adds, may, if desired, be smeared over 'with a surfacing of clear asphalt or other bituminous composition of any desired nature.' Accompanying the specifications are two figures, 1 and 2, which serve as a convention illustration of a horizontal section of a roadway made on the Warren plan. These are set out below:

Fig. 1.          Fig. 2.

"A represents the portion of the roadbed to which the patent relates, and which the patentee calls the 'wearing section' of a roadbed, and is the part which rests upon a macadam or other foundation, represented by the letter B. The letter C in Figure 2 represents the thin surfacing of clear asphalt, or bitumen, referred to above as useful, if desired. The mixture preferred

by the inventor is described by the inventor in his specifications as follows: 'I prefer to use from 1 to 3 per cent. of impalpable powder, from 10 to 30 per cent. of material between impalpable powder and one-fourth of an inch in size, and from 50 to 80 per cent. of material larger than one-fourth of an inch in size. I have found that these ingredients, when associated together, produce a mass or body having less than 20 per cent. of voids. I prefer to use as the uniting or plastic composition one which comprises asphalt and an oil flux heated to a moderate heat to provide the requisite fluidity; but I do not confine myself to any special form of artificial or natural asphalt.' This mineral part of the composition, the patentee says, is to be 'intimately associated with the plastic asphalt composition, which is then spread uniformly upon the prepared foundation, and which in settling becomes very dense, solid, and freer from voids than any pavement of which I have knowledge.' Among the advantages claimed in the patent specifications are: First, that the percentage of mineral matter employed is increased, and that of the bitumen decreased, thereby cheapening the cost; second, that the wearing qualities of the pavement are much increased, due to the fact that 'a very rigid and stable effect is obtained, which reduces strain and wear upon the uniting medium, more of the wear being borne by the mineral base and less by the uniting medium'; third, that the reduction of voids formed by the mineral constituents, in that they are larger and fewer, the plastic fluid filling such spaces with a cellular structure, which, it is claimed, adheres better to the surface of the stone pieces than when the interstices of the composition are smaller and more numerous."

Among the claims are the following: Nos. 5, 6, 7, 8, 9, 10, 11, 12, and 13.

"5. In a street pavement, a bituminous mineral structure. the mineral ingredients of which are mixed and of several grades, so graded as to give the structure an inherent stability.

"6. A bituminous street pavement structure, containing mixed mineral ingredients of such grades as to give the structure an inherent stability.

"7. A bituminous street pavement mixture, comprising a binder in combination with a mineral structure of inherent stability composed of wearing material of several grades uniformly mixed.

"8. A street paving mixture, comprising a bituminous binder in combination with a mineral structure of inherent stability.

"9. A street pavement wearing section, composed of a mineral structure of inherent stability formed of several grades of material so proportioned as to have a per cent. of voids less than 21 per cent. of the whole, in combination with a comparatively soft bituminous binder, filling said voids and rendering the whole permanent in nature and elastic and waterproof in character.

"10. A mixture for street paving purposes, composed of a bituminous binder and a mixture of mineral ingredients of several grades having less than 21 per cent. of voids, the binder sufficient in quantity to fill the voids.

"11. A street paving structure, composed of a mixture of mineral or wearing ingredients and a plastic binder, the space between the mineral ingredients being less than 21 per cent. of the whole, and the plastic binder occupying said space.

"12. A mixture of mineral or wearing ingredients of several grades, the ingredients of the descending grades in size and quantity being so proportioned to each other and to the voids existing in the larger grades as to fill the voids and impart to the structure an inherent stability in combination with a bituminous cement or binder.

"13. A mixture, to be used as a pavement, having an inherent stability composed of mineral or wearing ingredients of several grades, the grades being thoroughly mixed and thereby uniformly distributed throughout the mass, and being of sizes and quantities so proportioned that ingredients of the same grade are uniformly in contact with each other."

The specifications under which the mineral rubber pavement in controversy was contracted to be built, are as follows:

### "Specifications for Mineral Rubber Pavement.

"This pavement shall consist of a concrete base, a wearing surface of mineral rubber asphaltic concrete, a skim coat of pure mineral rubber asphalt,

and a top dressing of coarse torpedo sand, fine, clean gravel, or stone chips free from dust.

## "Foundation.

"On top of the subfoundation, prepared as heretofore stated in sections 31 and 32, there shall be laid a foundation of five (5) inches of Portland cement concrete made and composed as follows: Five (5) parts of good, clean, coarse, screened gravel; three (3) parts of clean, sharp sand, that will pass through a No. 14 and be retained by a No. 25 screen; and one (1) part of Portland cement, of a brand acceptable to the engineer. The concrete, after mixing, will be placed in the roadway and thoroughly tamped until free mortar shows on the surface of the bed, and the depth of the same shall then show five (5) inches. In other words, the concrete foundation shall be five (5) inches deep after the same has been thoroughly tamped and brought to a finish, and shall show a true and level surface. The concrete foundation shall be protected from the weather when deemed necessary by the engineer. Samples of the cement to be used are to be furnished to the engineer and subjected to the tests prescribed by the American Society of Civil Engineers, to the satisfaction of the engineer, before any work of concreting is done.

## "Wearing Surface.

"On the base, constructed as specified, a wearing surface of mineral rubber asphaltic concrete shall be laid, with a minimum thickness of 2 inches after compression, made up of crushed stone of various sizes, with a sufficient amount of sand, screenings, and stone dust to fill the interstices and reduce the voids to a minimum, and with enough mineral rubber asphaltic cement to coat all the particles and make a well-filled and water-tight paving mixture. The proportions of stone and sand shall be such as to produce the densest, practical mixture, and shall be approximately as follows: Crushed stone (so varying from $\frac{3}{4}$ inch to $\frac{1}{4}$ inch in size as to produce a mixture of approximately $\frac{1}{3}$ each of $\frac{1}{4}$ inch, $\frac{1}{2}$ inch and $\frac{3}{4}$ inch sizes), $\frac{2}{3}$; fine stone screenings, $1/6$: torpedo sand, $1/12$; fine sharp sand, $1/12$. Samples of stone to be used to be submitted to the engineer, to be subjected to tests as to satisfactory degree of hardness. If the crushed stone, as it comes from the crusher, is fairly well divided between the sizes specified, it will not be necessary to separate them; but all dust and screenings below $\frac{1}{4}$ inch must be removed and afterwards added in order to procure the specified quantities. The crushed stone and screenings must be made from hard, sound limestone, granite, or trap rock, and must be free from clay, loam, or other objectionable material. The sand shall be a clean sand, of the two grades specified above, and may be a lake shore, river, or bank sand, but shall be free and clean from loam or clay, and must not be coated with any foreign matter.

## "Mineral Rubber Asphaltic Cement.

"The mineral rubber asphaltic cement used in the wearing surface shall be Sarco Road Compound No. 251, manufactured by the Standard Asphalt & Rubber Company, of Chicago, or any asphaltic cement equal thereto. Samples of the asphaltic cement the contractors propose to use must be furnished to the engineer with all bids, and must be shown by analysis to comply with the following requirements, such analysis to be made by a chemist experienced in the analysis of hydrocarbons: The asphaltic cement shall be 99.5 per cent. pure bitumen, soluble in carbon disulphide ($CS_2$). Such bitumen shall contain from 73 per cent. to 76 per cent. petrolene, soluble in petrolic ether of 86 degrees Baume, and from 24 per cent. to 26 per cent. asphaltene, soluble in chloroform and not soluble in such petrolic ether. The melting point of the asphaltic cement shall be not less than 180 degrees F., nor more than 190 degrees F. Using the Dow penetration machine, the asphaltic cement shall not vary more than 5 millimeters in penetration from the following standard: 42 Mil. at 32 degrees F., with 200 grams weight on No. 2 needle for 1 min. 62 Mil. at 77 degrees F., with 100 grams weight on No. 2 needle for 5 sec. 114 Mil. at 115 degrees F., with 50 grams weight on No. 2 needle for 5 sec. The asphaltic cement shall be of a specific gravity of 98.5 at 77 degrees F., and weigh 8.2 lbs. per gallon, U. S. standard. When 20 grams of the asphaltic cement are heated in a dish $2\frac{1}{4}$ inches in diameter, $1^5/16$ inches deep, for seven hours in an

172 F.—27

oven, the interior of which is maintained at a constant temperature of 325 degrees F., it shall not lose in weight more than one-half of 1 per cent. The mineral rubber asphaltic cement shall be used in the proper quantity to thoroughly coat all the particles of the mineral aggregate, bind them together, fill the voids remaining after compression, and make a water-tight paving mixture. The quantity of asphaltic cement necessary to produce these results will vary somewhat, according to the character of the aggregates used, but will not in any case exceed 10 per cent., or be less than 8 per cent., by weight, of the total mixture. After being rolled, the surface shall present a granular appearance, showing that the structural body of the pavement is crushed stone. The asphaltic cement shall be in sufficient quantity to bind and fill the mixture as specified above, but not to flush to the surface as free cement under the roller.

## "Method of Mixing.

"The stone, sand, and screenings shall be placed in proper proportions in a properly designed dryer and thoroughly dried before combination with the mineral rubber asphaltic cement. The dryer shall be of the revolving type, or some other type which thoroughly agitates and turns the material during the process of drying, thereby preventing any caking of the material or adherence of dust to the surface of the stone. During the process of drying the aggregates shall be thoroughly mixed and heated to a temperature of from 300 degrees to 350 degrees F., and before cooling or exposure to moisture shall be mixed with the mineral rubber asphaltic cement, as further specified. The mineral rubber asphaltic cement shall be melted in a properly designed tank arranged so the heat can be properly and easily controlled and regulated. When melted and raised to a temperature of from 300 degrees to 350 degrees F., it shall be combined in the proper proportions with the hot stone and sand, and immediately mixed in a properly designed mixer with revolving blades until a thorough and intimate mixture of the ingredients has been accomplished, and the mineral particles evenly and thoroughly coated with the mineral rubber asphaltic cement. The mixer shall be arranged so as to retain the heat during the process of mixing, but shall not be exposed directly to the action of the fire. The materials entering into the paving mixture may be either measured or weighed, but in either case the means of obtaining the proper quantities shall be simple and positive, and easily controlled, so that even results may be obtained.

## "Method of Laying.

"While still hot from the mixer, the paving mixture shall be spread on the macadam or concrete base, and, edges having been tamped as hereinafter described, compressed with a 500-pound hand roller. The best results are obtained by spreading and rolling at as nearly the mixing temperature as possible. Therefore, if the paving mixture is hauled in wagons any considerable distance, tarpaulins must be used to cover the loads. The drying and mixing plant shall be placed as near as possible to the work, and, if practicable, immediately on the street itself. The material may be laid by the method employed in laying sheet asphalt pavement, or as follows: At distances apart of 6 or 7 feet, measured along the length of the street, set forms or leveling strips, the tops of which are to be the grade and crown of the finished pavement. These strips consist of planks 10 or 12 inches wide, of a thickness to give the desired thickness of pavement, held in place by long spikes driven through into the concrete base. These strips should be in as long lengths as practicable to handle easily, as they will then bend more readily to the crown of the street. The asphaltic concrete is then dumped between the first pair of leveling strips, roughly spread with rakes or shovels, and then struck off to a true surface with a straight edge, the edges tamped, and the mixture compressed while hot with a 500-pound hand roller. The strips are then moved forward and reset for the next spaces, and the spreading and straight edging of the asphaltic wearing surface continued. The 5-ton steam roller shall then be brought on freshly leveled material as soon as it is sufficiently cooled to bear the weight. The rolling shall be continued in both directions as long as any compression can be obtained. As the leveling strips are moved forward the leveled and rolled surface of the pavement may be used to guide the rear

end of the straight edge. Where the rolling is done up to the leveling strip, before it is removed and the next section spread, the edge of the rolled material shall be roughly cut and broken down and painted with a coat of pure mineral rubber asphaltic cement before the newly spread material is joined to it. Along the gutter lines, around manhole covers, and other places where the roller cannot reach the material, the compression shall be gotten by the use of hot iron tampers.

### "Skim Coat.

"As the rolling is finished, and while the surface is still fresh and clean, a skim coat of pure mineral rubber asphaltic cement shall be applied by pouring, and shall be spread with rubber squeegees; the object being to even up the slight depressions and irregularities in the surface of the asphaltic concrete, and provide a topping of pure asphaltic cement, into which the top dressing of sand or gravel is to be rolled. The skim coat shall be poured on at a temperature of 300 degrees F.

### "Top Dressing of Sand or Gravel.

"While the skim coat is still warm, a top dressing of coarse torpedo sand, fine, clean gravel, or stone chips, free from dust, which shall previously have been heated to a temperature of about 300 degrees F., shall be spread thickly enough to well cover the surface, and rolled with a 5-ton steam roller, more of the material being added, and the rolling continued, until the skim coat is thoroughly filled and no more of the material adheres to the surface. The surplus sand and gravel shall be left on the street surface for at least two weeks after the street is opened to traffic, and then any surplus not taken up by the skim coat may be swept off.

### "Patents.

"All fees for any patent, invention, article, or arrangement, or other apparatus that may be used upon or in any way connected with the construction, erection, or maintenance of the work herein provided, or any part thereof, embraced in the contract on these specifications, or any claims for damages arising out of or by reason of any infringements, shall be included in the price stipulated and in the contract for said work, and the contractor must protect and hold harmless the city against any and all demands for such fees or claims. The bond required of the contractor herein shall stand and be regarded as specially covering this clause, and if deemed necessary by the mayor and aldermen of the city of Montgomery the contractor shall stand ready and hereby agrees to execute other and further bond to a satisfactory amount conditioned specially to hold the city of Montgomery safe and harmless from the claims and demands of any and all persons whatsoever arising out of any claims for damages of royalties arising from patents."

A number of affidavits were introduced regarding a section of pavement laid in Washington City, which it is claimed showed that the Warren patent had been anticipated.

Jas. M. Head and Steiner, Crum & Weil, for complainant.

Chas. K. Offield, Coleman, Dent & Weil, and C. P. McIntyre, for defendants.

JONES, District Judge (after stating the facts as above). This patent has been sustained by the Circuit Court of Appeals for the Sixth Circuit in Warren Bros. Co. v. City of Owosso, 166 Fed. 309. Warren Bros. Company, the complainant in that suit, sought an injunction to prevent the infringement of the same patent in the Circuit Court of the United States for the Eastern District of Illinois, in which the Metropolitan Engineering & Construction Company intervened. In that case a preliminary injunction was refused. No opinion was rendered, and there is no statement of the reasons in the order denying the preliminary injunction there. Afterwards Warren Bros. Company

brought their suit in the Circuit Court of the United States for the Middle District of Alabama against the Metropolitan Engineering & Construction Company to prevent infringement of the same patent in the construction of a block of pavement on East Jeff Davis avenue, in the city of Montgomery.

It is insisted, as these last two suits present the same issues regarding the same patent, and the complainant and the main defendant in both cases are the same, that the Circuit Court in Alabama should follow the Circuit Court in Illinois and refuse a preliminary injunction. This insistence carries the doctrine of comity quite too far under the circumstances. It ignores altogether the comity due to the Circuit Court of Appeals of another circuit, which has rendered a final decision on the merits, and would exact more consideration for the mere refusal of the Circuit Court to grant a preliminary injunction, which does not necessarily decide anything on the merits, than for the decision of the Circuit Court of Appeals upholding the validity of the patent. If the ruling of the Illinois Circuit Court had been a final judgment adverse to complainant, still, with a final judgment the other way in the Circuit Court of Appeals in another circuit, this court would necessarily be compelled to exercise its own independent judgment in passing upon this motion. Here, however, the only judgment which has been rendered on the merits upholds the validity of the patent.

It is true the defendants here were not parties or privies to the litigation with the city of Owosso. It is a familiar rule, however, that:

"Certain matters regarding the validity of a patent are governed by established rules of legal definition and construction, and their determination is the same in every case, without reference to the parties, and sometimes without reference to the testimony. Whether or not the patented invention has resulted from inventive skill, or whether it is embraced in either of the classes protected by statute, whether the patent is formally sufficient, and what it claims as to the invention patented, are points which, once being carefully considered, may be regarded as permanently settled for the purposes of future litigation."

While in these matters judges are not bound to follow the decisions of tribunals of inferior or co-ordinate jurisdiction, the judicial comity which must always prevail in courts representing the same government and administering the same laws requires that judgments upon points like these should not be departed from without grave reasons for declaring them erroneous. American-Nicholson Pavement Co. v. City of Elizabeth, 4 Fish. Pat. Cas. 189, Fed. Cas. No. 312; Page v. Holmes Burglar Alarm Telegraph Co. (C. C.) 2 Fed. 330; Lockwood v. Faber (C. C.) 27 Fed. 63. The uniform course of decisions in the courts of the United States as to previous decisions rendered by a Circuit Court with regard to the validity of a patent has been to treat it as of the very highest nature, and as almost conclusive on an application for an injunction in another case founded on the same patent. American Middlings Purifier Co. v. Christian, 4 Dill. 448; Fed. Cas. No. 307; Hammerschlag v. Garrett (C. C.) 9 Fed. 43.

Save in cases where a prior decision operates as an estoppel upon the defendant, on an application for an injunction, all the issues are open to fresh inquiry and determination; the judgments being merely

evidence in favor of the plaintiff, and controlling the decision of the court only when not opposed by more convincing proof. When conflicting judgments have been rendered, the courts must follow those which, in view of all the tests of authority, appear to have the greater value, and if the question is still doubtful, and no other evidence is offered, it must decide in favor of the patent. United States Stamping Co. v. King (C. C.) 7 Fed. 860, 17 Blatchf. 55. When there has been an adjudication upholding the validity of the patent, the defendant in another case, who seeks to overthrow it because of new evidence not introduced in the former case, which should have led to a different result, must make good his contention. When the defense is anticipation, it must be shown; and, if there be any reasonable doubt on that point, it must be resolved against the defendant, on a motion for a preliminary injunction. Cantrell v. Wallick, 117 U. S. 689, 6 Sup. Ct. 970, 29 L. Ed. 1017; Bursh v. Condit, 132 U. S. 39, 10 Sup. Ct. 1, 32 L. Ed. 251; Coffin v. Ogden, 18 Wall. 120, 21 L. Ed. 821. In view of these principles, and after careful consideration of the new evidence regarding the Washington pavement, which was not before the court in the Owosso litigation, but was before the Circuit Court of Illinois, this court holds that the defense of anticipation is not made out.

The substance of the other defenses, leaving out the question of infringement vel non, is that the patent does not disclose invention, and that there has been double patenting. On these points the court is of opinion that at this stage of the proceedings it should follow the decision in Warren Bros. v. Owosso, supra. While that decision does not discuss the question of double patenting, it inevitably overrules that defense. I find, from an examination of the defendant's briefs before the Circuit Court of Appeals in that case, that the defense of double patenting was brought to the attention of the court and relied on. See Thompson-Houston Electric Co. v. Ohio Brass Co., 80 Fed. 712, 26 C. C. A. 107; Cleveland Foundry Co. v. Detroit Vapor Stove Co., 131 Fed. 853, 68 C. C. A. 233.

In Warren Bros. Co. v. City of Owosso, supra, it is said, on page 312 of 166 Fed.:

"Warren's invention, shortly stated, consists in the discovery that an aggregate of large and small pieces of stone, together with a certain proportion of stone dust, all mixed together and thoroughly permeated with bitumen or asphalt, results, when set, in a compact, stable structure, and is less liable to disintegrate from traffic or weather than any other method of grading or arranging the mineral constituents. Under the evidence, the particles are more compact in their relation to each other, and there is a minimum of friction in their interaction. The larger pieces of stone withstand the tendency of the small grains or dust to slip by each other and change the form of the pavement by disintegration and lumpy spots. The result is, therefore, a stability due to the arrangement of the mineral structure which enables the use of a softer asphalt or bitumen than would be otherwise feasible, inasmuch as a greater proportion of the wear and strain is carried by the mineral elements than by the binding constituent. This is, in substance, stated and claimed as an advantage over any other pavement composition by the patentee in his specifications. The fundamental idea of Warren is, not that the 'density' of his composition gives the stability which he claims, but that the mineral aggregate should of itself resist displacement by traffic. Neither the utility or intrinsic value of the Warren patent seriously denied, though its superiority over the sheet asphalt, under ordinary conditions, is by no means conceded.

Aside from any sort of concessions as to the utility and intrinsic value of the structure of the patent, its durability and practical value in use is established by a great volume of evidence coming from expert engineers acquainted with the pavement problem, as well from others who speak from observation of the pavement in use in many parts of the country. Its durability under traffic, its cleanliness, its noiselessness, and freedom from undue slipperiness, as compared to most forms of pavement, may be regarded as established."

The court held that the following claims, under the evidence before it, were infringed:

"5. In a street pavement, a bituminous mineral structure, the mineral ingredients of which are fixed and of several grades, so graded as to give the structure an inherent stability.

"6. A bituminous street pavement structure, containing mixed mineral ingredients of such grades as to give the structure an inherent stability."

"11. A street paving structure, composed of a mixture of mineral or wearing ingredients and a plastic binder, the space between the mineral ingredients being less than 21 per cent. of the whole, and the plastic binder occupying said space."

Upon the question of infringement, if the specifications for laying the pavement are adhered to, the court has been favored with the affidavits of some eminent experts, expressing directly opposite conclusions. The negation of infringement is based largely, if not entirely, upon the scope which the expert thinks proper to be allowed the several claims in the patent. If these claims in the patent are valid, as I must hold them to be on this application, it is difficult to hold that infringement will not result if the contract for laying down this pavement is carried out according to specifications. Putting the most favorable construction upon defendant's affidavits, it suffices to say that they do not raise sufficient doubt upon the question to justify a denial of a preliminary injunction, if it be otherwise proper.

The street paving, over the laying of which the dispute arises, will cover the distance of one block only in the city of Montgomery, on a street 50 feet wide and about 100 feet long. So far as the present record discloses, it is not contemplated to connect the pavement on this block with other kinds of paving, or even with the kind of paving for which the contract calls. The amount to be paid for the work is about $3,500, and the royalty exacted, if it were done under the Warren patent, would amount to a comparatively small sum. Complainant's affidavits show that the defendants were notified that the specifications under which the pavement is to be laid would infringe complainant's patent, and that complainant had offered to let the work be done under its usual royalty. Under the circumstances of the prior litigation concerning this patent, some of which was with the Metropolitan Engineering & Construction Company, it is not at all improbable that the laying of the pavement here was intended as a challenge in this jurisdiction of the patent or the validity of some of its claims. Neither the city nor the other defendant is in the position to set up public inconvenience from the stoppage of the work, which has not yet been begun, since the contract was made with full knowledge of the claims of complainant and that an injunction would probably be sought.

Nothing has been decided in the litigation in Illinois between the complainant and the Metropolitan Engineering & Construction Company which adjudges anything or estops either party from asserting the validity or the invalidity of this patent or any of its claims. If we

concede that comity controls the matter, this court, in view of the final decision of the Circuit Court of Appeals as to the validity of this patent, cannot refuse to entertain the suit brought here by the complainant against the Metropolitan Engineering & Construction Company and another person, not a party to the Illinois suit, to prevent a threatened infringement in Alabama. When an infringement of a patent is committed, or is about to be committed, in another jurisdiction, the complainant, who has brought a prior suit for such infringement in such jurisdiction, is not compelled to go back there to seek a fresh injunction against the same infringer, and another person not a party to that suit, and of whom it has no jurisdiction, to prevent infringement in another district. Complainant has a right under the Constitution and laws to choose either forum as to this particular infringement, and this court has no power to refuse to entertain the suit as to an infringement done or threatened within its jurisdiction. True, this may finally lead to conflicting judgments in the two courts as to the validity of this patent. Such results cannot be avoided under our present system, where no particular court has exclusive jurisdiction, and the validity of a patent may be tested in different courts of co-ordinate jurisdiction at the same time, and even by the same parties, when nothing has been decided in the litigation between them estopping either of them from setting up new evidence on points which may finally overthrow the patent.

Comity cannot prevent such results; but neither of the courts so circumstanced ought to go any further than the necessities of the particular case in its own jurisdiction absolutely require. Neither should attempt to decide upon an infringement committed in the jurisdiction of the other, nor should either court require an accounting between the parties as to an infringement committed in the jurisdiction of the other. The bill here not only seeks to prevent infringements in Alabama, but elsewhere, and also an accounting here for all gains, incomes, and profits which defendants may have gained from like infringements since the transfer of the Warren patent to the complainant. Should this court attempt to give that relief, and the suit in Illinois continue to be prosecuted, the same parties might be bound at the same time by conflicting judgments; the one holding that complainant was not entitled to an accounting and the other holding that it was. This would be a reproach to justice. This court, if it be found on final hearing that the complainant is entitled to relief, will, so long as the suit is pending between the parties about other infringements in Illinois, refuse to entertain any inquiry as to infringements in Illinois, or as to any accounting between the parties, save as to transactions in Alabama.

We repeat, if complainant's patent be in fact infringed, or is about to be infringed, it has a right to complain in whatever jurisdiction that infringement takes place, and it cannot be cut off from this right because it has a suit in another court against the main infringer for a like infringement there, in which nothing has been adjudged; nor can complainant be turned out of the equity court here, on the theory that, having established a royalty, a recovery at law will be adequate compensation, and the injury cannot be irreparable in such sense as to give it a standing in a court of equity. Irreparable injury, in the sense

here used, does not necessarily mean that complainant will be ruined or grievously harmed, if the court of equity does not intervene, but only that some legal right of complainant will be illegally taken from it, which in equity and good conscience it is entitled to enforce, the proper and full enjoyment of which will be impaired or lost, if the court of equity declines to interfere and puts complainant to its action at law for damages.

A large element in bringing a patent into use and giving it a market value is the estimate of the public as to its utility, and whether persons who deal in the process or manufacture believe the same result can be effected under another process, to be had by dealing with other parties at less cost. The completed work here would advertise itself, in most effective form, as a pavement of equal merit to that covered by the Warren patent, laid down and used in defiance of the rights of the patentee, in the capital of the state, where it would inevitably attract attention as the work of a competitor who offers to furnish the process at less cost than it could be had under the patent. At this time, perhaps, more than at any other period, states and municipalities are concerned in building roads and streets and as to the best methods of construction. It is difficult to see how far the failure of complainant to seek injunctive relief to prevent the building and use of such pavement would affect the value of its patents or diminish the number of licenses to use it. The reputation of a patent, like the good name of an individual, is easily injured, and it is hard, no matter how wrongful the injury, to counteract its effect. An ounce of prevention is worth a pound of cure. The full damage which might be inflicted upon the patentee, under such circumstances, if the patent be in fact infringed, is largely speculative, cannot be accurately ascertained, and therefore cannot be recovered at law. Equity alone can give an adequate remedy.

The court has made laborious examination of the records in the litigation concerning this patent in the Circuit Court of Appeals and in the Circuit Court of Illinois, and has carefully considered the points and arguments made by counsel and the numerous affidavits filed in this case. The pressure of other business upon the court prevents any further discussion of them. Under the circumstances of this case, substantial justice will be done between the parties at this time by allowing the work on East Jeff Davis avenue to be undertaken and completed, upon defendants' executing a bond to complainant in the sum of $1,500, conditioned to pay all such costs and damages as may be awarded against defendants in this suit, if upon final hearing it shall be adjudged that the street paving on East Jeff Davis avenue infringes any claim complainant can lawfully set up under letters patent No. 727,505. If defendants fail to give bond within 20 days, then upon complainant's application a preliminary injunction may issue, forbidding the execution of the contract between the city of Montgomery and the Metropolitan Engineering & Construction Company, under the specifications made a part of the contract for the laying of the pavement, so far as concerns the laying of the top or wearing surface of the street.

All other questions are reserved.