## WARREN BROS. CO. v. CITY OF OWOSSO.

(Circuit Court of Appeals, Sixth Circuit. January 13, 1909.)

### No. 1,828.

1. PATENTS (§ 32*)—EVIDENCE OF INVENTION—PRESUMPTION.

That a patentee believed himself to be the inventor of the thing patented is presumed from his oath to that effect, and that presumption must stand until overthrown by very clear evidence.

[Ed. Note.—For other cases, see Patents, Dec. Dig. § 32.*

Presumptions and burden of proof of invention, see note to American Sulphite Pulp Co. v. De Grasse Paper Co., 87 C. C. A. 264.]

2. PATENTS (§ 30*)—INVENTION—NATURE OF PATENTABLE INVENTION.

In the sense of the patent statute, he is the first inventor who by his own thought makes an article or material, and first perfects and adapts his discovery to actual use, although some one may have previously made a similar article without putting it to practical use or giving his discovery to the public in any way.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 34; Dec. Dig. § 30.*]

3. PATENTS (§ 56*)—ANTICIPATION—NATURE OF PRIOR USE.

The use of a composition as a waterproof lining for a reservoir did not anticipate a subsequent patent for a street pavement made of a similar composition.

[Ed. Note.—For other cases, see Patents, Dec. Dig. § 56.*]

4. PATENTS (§ 54*)—ANTICIPATION—ABANDONED EXPERIMENTS.

Abandonment of an invention in its experimental stage is a question of intention, and may be shown by conduct even within the two years allowed by the statute; but the use of an invention by the inventor for the purpose of testing its utility, which is not a public use, may continue indefinitely.

[Ed. Note.—For other cases, see Patents, Dec. Dig. § 54.*

Abandonment of invention, see note to Hayes-Young Tie Plate Co. v. St. Louis Transit Co., 70 C. C. A. 6.]

5. PATENTS (§ 54*)—ANTICIPATION—ABANDONED EXPERIMENTS.

An employé of an asphalt company, largely engaged in street paving, conducted a series of experiments with what he called asphalt concrete for the purpose of discovering new uses for asphalt, one of which was the use of such concrete for a floor in a driving shed on the company's premises, another as a foundation for machinery, and a third in making a section of sidewalk on a public street, but no other use of it was made until after, more than six years later, complainant obtained a patent for the use of a similar composition for paving, when the company also commenced using it for the same purpose. *Held*, that the company's prior use was an abandoned experiment, which did not anticipate complainant's patent.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 73; Dec. Dig. § 54.*]

6. PATENTS (§ 65*)—ANTICIPATION—FOREIGN PATENTS.

To overthrow a patent by a foreign one of prior date, the description of the invention must be in such full, clear, and exact terms as to enable

---

one acquainted with the art to which it belongs to make or practice the invention.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 80; Dec. Dig. § 65.*]

7. PATENTS (§ 328*)—INFRINGEMENT—STREET PAVEMENTS.

The Warren patent No. 727,505, for an improvement in street pavements, which consists in making the top layer or wearing surface of pavements having a foundation of mineral matter of mineral material of assorted sizes, from 50 to 80 per cent., being larger than one-fourth of an inch in diameter and up to two inches, united by asphalt or other plastic material, the purpose being to make such section more solid, compact, and durable than when fine material only is used, was not anticipated, and discloses invention. Also *held* infringed.

[Ed. Note.—For other cases, see Patents, Dec. Dig. § 328.*]

Appeal from the Circuit Court of the United States for the Eastern District of Michigan.

This is a bill to enjoin infringement of a patent granted to Frederick J. Warren for "a new and useful improvement in street pavements." The patent was issued May 5, 1903, and bears the serial number 727,505. Upon the pleadings and proof the bill was dismissed, and the complainants below have appealed. The Barber Asphalt Paving Company, having constructed the alleged infringing pavement for the city of Owosso, has appeared and assumed the entire burden of defense.

The invention relates to an improvement in that class of street pavements consisting of a foundation of mineral matter and a top surfacing, or wearing surface, made of graded mineral matter intimately associated and united by means of asphalt or coal tar. The inventor claims as his discovery that the best conditions of this top or surface of a mineral roadbed is that this top or wearing surface of such pavements "must be made as dense, as free from voids, as possible, and also stable and nonliable to displacement." Under the art, as practiced theretofore, the inventor says that the mineral matter united by plastic material has generally been fine gravel or sand or broken stone, not exceeding pieces of stone or other ground material above one-tenth of an inch in diameter; that the smallest percentage of voids under that method was 21 per cent. of the aggregate. He declares that to secure stability there must be a departure from this method, and that by the employment of larger-sized pieces, "say up to those which will pass through a two-inch ring, and employing with these larger grains proper quantities of the smaller sizes down to an impalpable powder, it is possible to reduce the voids of the mineral base below ten per cent. of its bulk." Such an assemblage, he says, "compacted together, will form a dense, solid, homogeneous, compact body with the smallest percentage of voids, and possessing the highest degree of stability, and one in which the largest and smallest pieces are associated with each other indiscriminately throughout the structure, and one which, because of the sizes of the pieces and their arrangement with respect to each other, offers the smallest areas of surface for the attachment of the plastic composition to them, so that not only is a superior binding effected, or union obtained, by the plastic composition, but a smaller quantity of it is necessary for the purpose of obtaining the superior result or product." The specifications lay stress upon the fact that the stone components of different sizes are not to be used in layers of corresponding sizes, but mixed together, the large, the small, and the dust in one aggregate with the asphalt or other plastic composition permeating the whole mass and uniting the particles by filling in the voids and making a solid surface. This composition is spread uniformly over the top of a roadbed foundation, preferably of macadam, and is intended to form only the top or wearing surface of such a roadbed. This top section, he adds, may, if desired, be smeared over "with a surfacing of clear asphalt or other bituminous composition of any desired nature." Accompanying the specifications are two figures, 1 and 2, which serve as a conven-

tional illustration of a horizontal section of a roadway made on the Warren plan. These are set out below.

**Fig. 1.**                    **Fig. 2.**

A represents the portion of the roadbed to which the patent relates, and which the patentee calls the "wearing section" of a roadbed, and is the part which rests upon a macadam or other foundation, represented by the letter B. The letter C, in Fig. 2, represents the thin surfacing of clear asphalt or bitumen, referred to above as useful, if desired. The mixture preferred by the inventor is described by the inventor in his specifications as follows:

"I prefer to use from one to three per cent. of impalpable powder, from ten to thirty per cent. of material between impalpable powder and one-fourth of an inch in size, and from fifty to eighty per cent. of material larger than one-fourth of an inch in size. I have found that these ingredients when associated together produce a mass or body having less than twenty per cent. of voids. I prefer to use as the uniting or plastic composition one which comprises asphalt and an oil flux heated to a moderate heat to provide the requisite fluidity; but I do not confine myself to any special form of artificial or natural asphalt."

This mineral part of the composition, the patentee says, is to be "intimately associated with the plastic asphalt composition, which is then spread uniformly upon the prepared foundation and which in setting becomes very dense, solid, and freer from voids than any pavement of which I have knowledge." Among the advantages claimed in the patent specifications are: First, that the percentage of mineral matter employed is increased, and that of the bitumen decreased, thereby cheapening the cost: second, that the wearing qualities of the pavement are much increased. due to the fact that "a very rigid and stable effect is obtained which reduces strain and wear upon the uniting medium, more of the wear being borne by the mineral base and less by the uniting medium; third. that the reduction of voids formed by the mineral constituents, in that they are larger and fewer, the plastic fluid filling such spaces with a cellular structure, which, it is claimed, adheres better to the surface of the stone pieces than when the interstices of the composition are smaller and more numerous.

The claims in issue are 5, 6, 9 and 11, and are as follows:

"(5) In a street pavement, a bituminous mineral structure, the mineral ingredients of which are fixed and of several grades, so graded as to give the structure an inherent stability.

"(6) A bituminous street pavement structure containing mixed mineral ingredients of such grades as to give the structure an inherent stability."

"(9) A street pavement wearing section composed of a mineral structure of inherent stability formed of several grades of material so proportioned as to have a per cent. of voids less than twenty-one per cent. of the whole, in combination with a comparatively soft bituminous binder filling said voids and rendering the whole permanent in nature and elastic and waterproof in character."

"(11) A street paving structure composed of a mixture of mineral or wearing ingredients, and a plastic binder, the space between the mineral ingredients being less than twenty-one per cent. of the whole, and the plastic binder occupying said space."

W. K. Richardson, James M. Head, and George O. G. Coale, for appellant.

H. N. Paul, Jr., and J. C. Fraley, for appellee.

Before LURTON and SEVERENS, Circuit Judges, and COCHRAN, District Judge.

LURTON, Circuit Judge (after stating the facts as above). The street pavement of the Warren patent is plainly differentiated from the pavement structures in practical use before his invention, and no serious effort has been made to show its anticipation by any of the known and practical methods of making roadways. The old and well-known forms of such structures included roadways made of granite or other hard stone blocks, vitrified brick, blocks or strips of wood, and well-known macadam. A more modern, and yet well-known, pavement is known as "sheet asphalt." Each of these forms had its well-known advantages and disadvantages. The structures of blocks of granite or other stone, or brick, were notably durable, but they were noisy and slippery. Blocks of wood become too smooth and slippery. A defect common to all block pavements, whether of wood, or stone, or brick, is that their joints become harbors for filth, causing such pavements to become very unsanitary. The macadam was made entirely of stone broken into pieces of irregular sizes and laid in layers, the bottom one being generally of large cracked stone filled in with finer stone. Over this was laid a layer some inches deep of broken stone rolled down with heavy rollers, and on top a surfacing of fine stone dust, which, when wet, formed a temporary cement. This is not particularly noisy, but in wet weather is muddy or pasty, and in dry weather very dusty. In durability it was very defective. The macadam roadway is the foundation ordinarily for the Warren bitulithic structure, as shown by the specifications of the patent.

The sheet asphalt pavement belongs to a later class, and, like the Warren pavement, is intended only as a top or wearing section over a foundation of broken rock like the ordinary macadam. The surfacing of the pavement is composed of sand with the interstices filled with bituminous cement. If made with a bitumen hard enough to constitute a rigid structure at summer temperatures, it is shown to be so brittle in severe cold as to crack and break up under traffic. If soft enough to resist the breaking effect of traffic during cold weather, the evidence tends to show that the grains of sand through friction slip by each other, and under the influence of traffic the sheet surfacing is subject to be pressed into irregularities, making an uneven or humpy surface, resulting in disintegration. Neither is such a pavement so waterproof as to prevent altogether the penetration of water with bad results. Aside from the defects in the matter of durability under ordinary street traffic conditions, it is shown that the standard asphalt pavement is unduly slippery and affords a bad footing for horses, especially when wet or upon slopes.

Warren's invention, shortly stated, consists in the discovery that an aggregate of large and small pieces of stone, together with a certain proportion of stone dust, all mixed together and thoroughly permeated with bitumen or asphalt, results, when set, in a compact, stable structure, and is less liable to disintegrate from traffic or weather than any other method of grading or arranging the mineral constituents. Under the evidence, the particles are more compact in their relation to each other, and there is a minimum of friction in their interaction. The larger pieces of stone withstand the tendency of the small grains or dust to slip by each other and change the form

of the pavement by disintegration and lumpy spots. The result is therefore a stability due to the arrangement of the mineral structure which enables the use of a softer asphalt or bitumen than would be otherwise feasible, inasmuch as a greater proportion of the wear and strain is carried by the mineral elements than by the binding constituent. This is, in substance, stated and claimed as an advantage over any other pavement composition by the patentee in his specifications. The fundamental idea of Warren is not that the "density" of his composition gives the stability which he claims, but that the mineral aggregate should of itself resist displacement by traffic. Neither is the utility or intrinsic value of the Warren pavement seriously denied, though its superiority over the sheet asphalt, under ordinary conditions, is by no means conceded. Aside from any sort of concession as to the utility and intrinsic value of the structure of the patent, its durability and practical value in use is established by a great volume of evidence coming from expert engineers acquainted with the pavement problem, as well from others who speak from observation, of the pavement in use in many parts of the country. Its durability under traffic, its cleanliness, its noiselessness, and freedom from undue slipperiness as compared to most other forms of pavement structure may be regarded as well established. Indeed, the record of the proceedings below and the briefs and oral argument here have, in substance, reduced the case to the simple question of whether the invention of the patent had not been anticipated.

Laying on one side for later notice certain patents which have, in a way, been referred to as anticipations, and the use of an asphalt concrete as a lining for a reservoir on the Pacific Coast, the great weight of the evidence and argument has been addressed to an alleged anticipation in 1896 and use since that date of a bit of sidewalk in front of the Asphalt Street Paving Company's office at Long Island City, N. Y. If the defendant's evidence is to be believed and credited as precisely describing the mixture of the materials employed in building this piece of sidewalk, it must be conceded that the method and materials used in that pavement are such as are covered by the fifth, sixth, and eleventh claims of the Warren patent, they being the broad claims allowed the inventor. It may also be conceded that the infringement here involved substantially follows the method and materials claimed to have been used in the sidewalk construction referred to. The Asphalt Street Paving Company, which constructed the street pavement at Owosso, and which has assumed the defense of this case, very emphatically urge that, if the Owosso construction infringes the broad claims of the Warren patent, their 1896 sidewalk was an anticipation. But this conclusion does not necessarily follow, for the argument loses sight of the question as to whether the sidewalk construction relied upon as an anticipation was anything more than an abandoned experiment. Whether a patentable invention would be involved by the employment of the same construction for roadway purposes which had been publicly employed for sidewalk purposes is another question, and one which we pretermit now as not necessarily presented upon the facts of this case.

The defense of anticipation by prior construction is not, however, limited to the sidewalk referred to, though that is the alleged anticipation upon which the argument has been mainly addressed, and in respect to which a very large part of an immense record relates. The earliest use of such a composition as that embraced within the broad claims of the Warren patent is an asphalt concrete lining for a water reservoir in California, put in by one Stanton, a civil engineer, in 1895. A paper read by Stanton describing the composition used by him as waterproof before the Society of American Civil Engineers describes the composition. The society published this paper in its proceedings, and it came to the notice of a Mr. Upham, a civil engineer in the service of the Asphalt Paving Company, who in December, 1895, addressed a report to the then president of that company, based upon the Stanton paper, upon the "Uses of Asphalt for Purposes Other than Paving." Nothing is suggested in that report about the use of such a concrete for paving purposes. He does, however, report that "careful experiments upon these lines would result in the production of an asphalt concrete suitable for reservoirs and dams," and that it might be found useful for roofing, castings for pipes, etc. In the following March and April, Upham made four experiments with what he calls concrete. The first of these was two asphalt concrete blocks which he suggested might prove suitable for a lining for the Erie Canal. Nothing came of this, and it may be dropped as an abandoned, incomplete experiment, to say nothing as to its remoteness from the subject of street paving. The second was the floor of a small shed upon defendant's premises. The third was the sidewalk referred to, and the fourth and last was an asphalt concrete foundation for machinery. Each one of these have a common resemblance in that they were a series of experiments intended to discover other uses for asphalt, but not one of these went into public use. Aside from the sidewalk referred to, not one of them had any relation to the difficult problem of roadways, and did not teach the public anything of value in that direction.

The lining in the reservoir, says Stanton's paper, "was painted with hot asphaltum paste mixed in the same proportions, but boiled a much longer time, until when entirely cold it was hard and brittle, breaking under a hammer like glass, yet tough, elastic, and pliable with the least warmth." It is evident that such a lining was not designed or fitted to meet the wear and disintegrating influences to which the wearing section of a street pavement would be subject, and that it taught little or nothing in the art of street paving. The conditions involved in a successful street pavement are so materially different from those involved in waterproofing a reservoir as not by any means to make the solution of one the solution of the other. The disclosures with respect to the usefulness of such a composition for a reservoir teach little of value as to the other. Clough v. Barker, 106 U. S. 166, 176, 1 Sup. Ct. 188, 27 L. Ed. 134; Ajax Metal Co. v. Brady Brass Co. (C. C.) 155 Fed. 409, 419. The use of an asphalt cement foundation for machinery was purely experimental. It is quite remote from street-paving construction, and may be dismissed, both as an abandoned experiment and as teaching nothing of value in the art of street paving. The shed driving floor

was on their own premises. It was demonstrably an experiment under conditions not such as to determine its value for street-pavement purposes. Neither is the evidence satisfactory as to its endurance, although the conditions were favorable for its preservation. That a particular composition was found useful for reservoir linings, machinery foundations, or the floors of small private sheds does not necessarily anticipate a subsequent use of the same material in roadway construction, the conditions being in each case so entirely different.

The sidewalk construction was much the closest approximation to the invention of Warren. That Warren believed himself to be the discoverer of his composition for street paving is presumed from his oath to that effect, and that presumption must stand until overthrown by very clear evidence. Smith v. Goodyear Dental Vulcanite Co., 93 U. S. 486, 23 L. Ed. 952; Elizabeth v. Pavement Co., 97 U. S. 126, 24 L. Ed. 1000. He died before the evidence was taken, and was not able to testify in support of this presumption. The circumstance that he was in the service of the Asphalt Company when this pavement was put down amounts to nothing, in view of the fact that he was then and for a long time afterwards on service in the far West and had no connection whatever with Upham's experiments. That he subsequently saw the pavement is by no means enough to charge him with knowledge of the composition. The evidence fails to convince us that he acquired his knowledge from that source. The presumption that he believed himself to be the inventor of the pavement for which he was given a patent must be our starting point in determining whether his patent is defeated by anticipation. That somebody had, in fact, made the same composition before he did does not necessarily defeat his patent. In one sense, he would not be the first inventor in such case. But, in the sense of the patent statute, he is the first inventor who, by his own thought, makes an article or material and first perfects and adapts his discovery to actual use, although some one may have previously made a similar article without putting it to practical use or giving his discovery to the public in any way. Gayler et al. v. Wilder, 10 How. 477, 496, 13 L. Ed. 504; Seymour v. Osborne, 11 Wall. 517, 552, 20 L. Ed. 33; Albright v. Celluloid Co., 2 B. & A. 629, 1 Fed. Cas. 320 (No. 147); Bullock Printing Press Co. v. Jones et al., 3 B. & A. 195, 4 Fed. Cas. 659; Agawan Co. v. Jordan, 7 Wall. 583, 602, 19 L. Ed. 177; Whiteley v. Swayne, 7 Wall. 685, 687, 19 L. Ed. 199; Deering v. Winona Harvester Works, 155 U. S. 286, 301, 15 Sup. Ct. 118, 39 L. Ed. 153; The Corn Planter Patent, 23 Wall. 181, 211, 23 L. Ed. 161; Smith v. Goodyear Dental Vulcanite Co., 93 U. S. 486, 498, 23 L. Ed. 952; Gamewell Fire-Alarm Tel. Co. v. Municipal Signal Co., 61 Fed. 948, 951, 10 C. C. A. 184.

The fact that the sidewalk was purely experimental as to the value of such a product for that purpose is indicated by several circumstances. It was one of a number of experiments made about the same time for the purpose of ascertaining uses for asphaltum other than in the form of a sheet-wearing surface for street pavements. The office was upon a street corner. The front sidewalk alone was made of the composition covered by the Warren patent. The larger piece of

sidewalk along the side of the building was made of sheet asphaltum, the sand and asphalt mixture used continually by that company down to 1902 when they began to infringe the Warren patent. That two kinds of sidewalks were there constructed indicates the experimental character of the work, and counsel for appellees in their printed brief say, in explanation, "Presumably it was desired to secure some sort of comparison of the durability of the two materials." There is evidence as to certain cracks in this pavement not clearly explained. Their presence suggests doubt as to the closeness with which Upham approximated the Warren invention, which are increased when we find that the composition of the materials for the pavement was made in a number of independent batches under verbal instructions as to the proportion of the mineral ingredients, which Mr. Fowler, who was one of the employés engaged in the work, says were changed from time to time. It is likely that these varying proportions led to an uneven result. The presumption is strong that the experiment was not regarded as successful in teaching anything of value to the pavement art, for it was never repeated, and no sidewalks were ever put down of that character, although that kind of work was a part of their business. It was an experiment when the pavement was laid, and continued to be such until the result could be proved. The subsequent continued use of their old sand and asphalt mixture, both for sidewalks and street purposes, for nearly six years and down to the infringement here complained of, is conduct plainly indicating that they had abandoned their efforts to find a better composition and treated the experiments of Upham in 1896 as unsuccessful. And, if the fact was that this Upham concrete did not prove desirable, it casts grave doubt as to whether Upham built his sidewalk upon the prescription of Warren's invention. They did, it is true, use the Upham composition as a material for roofing certain parts of the government work at Ft. Willitt. But this was a confessed failure. Experiments which did not in six years result in any change in the company's sand and asphalt mixture as applied to either sidewalks or street pavements can but be regarded as unsuccessful. When Warren had demonstrated the great value of the bitulithic pavement, and competition with that mode of construction arose, the Asphalt Company reverted to this old bit of sidewalk as an anticipation which would enable them to defy Warren's patent. A significant circumstance tending to show the unsuccessful and abandoned nature of this sidewalk experiment is found in the attitude of Mr. Clifford Richardson, who applied for an English patent in 1897 for an "improvement in asphaltic pavements" upon lines directly in the teeth of the teaching of the Warren conception. Thus he states, in his specifications:

"Experience with such pavements as have worn the best shows that they have accidently been made with sand containing but a small proportion of coarser sized particles. Further experimental tests have shown me that it is desirable to have the mineral aggregate rich in particles of the size passing the 200, 100 and 80 mesh sieves, and I have also found that mineral aggregates which carry much fine material will carry more bitumen, will prove more dense and compact, and will have better wearing properties than those made of coarser material and which will carry more bitumen."

The claims of his patent proceed upon this line. From January 1, 1896, to January, 1900, Mr. Richardson was "superintendent of tests"

for the Asphalt Company, and since that time has been its "adviser in technical and other matters and in charge of the work done by the company in its technical aspects," and is the principal expert witness for that company in this case. Richardson did not have control or participate in the Upham experiments, but was thoroughly acquainted with the concrete composition and the experimental sidewalk when he applied for this English patent. This indicates most plainly that their expert superintendent of tests was proceeding in direct opposition to the teaching of Warren, whose real discovery was that, by the use of a large proportion of mineral in pieces as large as two inches in diameter, mingled with small pieces graded down to dust, less bitumen was needed to act as a binder, because the mineral ingredients so graded and mingled furnished stability as well as density, which relieved the carrying strain upon the bitumen.

The contention that the construction of this sidewalk was not an experiment, because it was laid upon a public highway and subjected to practical public use, does not take it from the category of experiments. It was a product which could only be tested with respect to its durability for pavement purposes by laying it upon a highway. The facts, in this respect, are similar to those in Elizabeth v. Pavement Company, 97 U. S. 126, 24 L. Ed. 1000, where it was held that Nicholson's pavement had not been in public use, within the meaning of the patent law, because an experimental section had been laid down and used by the public for some six years before he applied for a patent. That use was held, upon the facts of the case, to have been purely an experimental one. The teaching of the Elizabeth Paving Case upon this matter is that a test of utility and endurance made in good faith by putting down a small section of a street paving or sidewalk upon the highway at the expense of the inventor and by consent of those having authority is not such a public use as necessarily to anticipate a subsequent independent invention of the same pavement. Nevertheless, long delay in making his application was urged as indicating that he had abandoned his invention to the public. But this was met by evidence that he had no other intention than to test its endurance and utility, it being shown that he made frequent close examinations, was constantly inquiring as to how it was liked, and spoke of it as a test he was making to determine its usefulness as a street pavement. Abandonment of an invention in its experimental stage is a question of intention, and may be shown by conduct, even within the two years allowed by the statute. But the use of an invention by the inventor for the purpose of testing its utility, which is not a public use, may continue indefinitely, if for the purpose of perfecting, improving, or testing its utility. That this Upham sidewalk was not torn up was doubtless due to the character of the experiment. The material was useless for other purposes, and it could not be cast aside or devoted to another use as a discarded experimental machine. The results from the experiment were not deemed important enough to induce the construction of other sidewalks nor the material tried for street-pavement purposes, for it should not be altogether ignored that, though the analogy between street pavement and sidewalk pavement is close, there are material differences between the two problems. In one,

the wear and strain to which it is subjected is that of the passage of pedestrians. In the other, the influences which tend to disintegration are those resulting from the steel-shod feet of horses and the grinding pressure of vehicular traffic. The failure in any way to prosecute the experiment under the circumstances is conduct from which abandonment may be imputed.

In Potts v. Creager, 155 U. S. 597, 604, 15 Sup. Ct. 194, 39 L. Ed. 275, an alleged prior use was not considered a success "from the fact that the machine was never reconstructed." The effect of conduct as evidence of abandonment is also referred to in Gayler v. Wilder and other cases cited heretofore, as well as in the case of the Corn Planter Patent, 23 Wall. 181, 23 L. Ed. 161, and in Deering v. Winona Harvester Works, 155 U. S. 286, 301, 15 Sup. Ct. 118, 39 L. Ed. 153.

We are the more indisposed to treat this piece of experimental sidewalk as an anticipation because, in the wide range which has been covered by the evidence in this case, it has not been shown that anywhere had there been constructed a single rod of street pavement according to his plan prior to his invention. Under such circumstances, we cannot think the proof of anticipation strong enough to deprive him of his invention.

The patents relied upon as anticipations need little notice, and have received little attention in briefs or arguments. Those most worthy of attention are the Van Camp and Clark provisional English specification and the British patents to Ward. They are both lamentably lacking in instruction as to the proportions of mineral ingredients of the different grades. They do propose the use of large stones and smaller ones to fill the voids together with asphalt or tar. But they do not disclose Warren's basic idea of using the several grades of stones so graded as that the stone aggregate will of itself have inherent stability, which will relieve in large part the burden and strain upon the bitumen binder. Warren gives clear directions as to the construction, and clearly discloses the factor of stability resulting from properly grading the mineral ingredients in excess of that found in the greater density of the sand and asphalt concrete. To overthrow a patent by a foreign one of prior date, the description of the invention must be in such full, clear, and exact terms as to enable one acquainted with the art to which it belongs to make, construct, and practice the invention. Mere vague and general representations in a foreign patent will not support the defense of anticipation. A fatal objection to the Ward English patents is found in the fact that printed copies were not on sale prior to the actual date of Warren's invention, which is clearly shown to have been made not later than January 4, 1900. The Warren patents were not published prior to October of 1900.

The fifth, sixth, and eleventh claims are infringed. The ninth is not, as it is not shown that the defendants below employed the "comparatively soft bitumen binder," made an element of that claim.

The decree must be reversed, and the case remanded for an accounting.