WARREN BROS. CO. v. CITY OF GRAND RAPIDS et al.

(District Court, W. D. Michigan, S. D. November 4, 1912.)

PATENTS (§ 328*)—INFRINGEMENT—SURFACING COMPOSITION FOR PAVEMENTS.
    An injunction granted, restraining the carrying out of a paving contract with a city on the ground that its performance according to its specifications would necessarily involve infringement of the Warren patent, No. 727,505, for a wearing surface of a pavement.

In Equity. Suit by the Warren Bros. Company against the City of Grand Rapids and Edward W. Seamans. On final hearing. Decree for complainant.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Wilson & Johnson, of Grand Rapids, Mich. (James M. Head, of Boston, Mass., of counsel), for complainant.

Taggart & Taggart, of Grand Rapids, Mich., for defendant City of Grand Rapids.

Bulkley & Swenarton, of Chicago, Ill., for other defendants.

SESSIONS, District Judge. This is a suit to enjoin the carrying out of a contract between the two defendants for the construction of a pavement on Barclay street in the city of Grand Rapids. It is claimed by complainant that the performance of this contract according to its specifications will necessarily involve an infringement of its patent No. 727,505 for the wearing surface of a street pavement which, after careful consideration, has been construed and sustained by the Circuit Court of Appeals of this circuit in the case of Warren Bros. Co. v. Owosso, 166 Fed. 309, 92 C. C. A. 227. In that case the court thus described and construed the invention covered by claims 5, 6, 9, and 11 of the patent:

"Warren's invention, shortly stated, consists in the discovery that an aggregate of large and small pieces of stone, together with a certain proportion of stone dust, all mixed together and thoroughly permeated with bitumen or asphalt, results, when set, in a compact, stable structure, and is less liable to disintegrate from traffic or weather than any other method of grading or arranging the mineral constituents. Under the evidence, the particles are more compact in their relation to each other, and there is a minimum of friction in their interaction. The larger pieces of stone withstand the tendency of the small grains or dust to slip by each other and change the form of the pavement by disintegration and lumpy spots. The result is therefore a stability due to the arrangement of the mineral structure which enables the use of a softer asphalt or bitumen than would be otherwise feasible, inasmuch as a greater proportion of the wear and strain is carried by the mineral elements than by the binding constituent. This is, in substance, stated and claimed as an advantage over any other pavement composition by the patentee in his specifications. The fundamental idea of Warren is not that the 'density' of his composition gives the stability which he claims, but that the mineral aggregate should of itself resist displacement by traffic."

The basic idea of the Warren pavement is the so-called "inherent stability" of the mineral aggregate in its composition, which consists of the two elements of density, or absence of voids, and stability, or resistance to displacement, existing independently of the plastic binder. Its distinguishing characteristic lies in the fact that the density and stability, which together create and constitute its inherent stability, are produced by combining and mixing indiscriminately throughout the whole body of the wearing surface coarse and fine particles of mineral matter such as stone, sand, and dust or impalpable powder. The inventor claims (and for the purposes of this case his claims have been sustained and established) that when mineral particles of properly graded sizes are so combined, mixed, and coated with bituminous cement and the whole then thoroughly compacted by pressure, a solid, homogeneous, waterproof wearing surface will be produced in which the voids will be reduced to below 21 per cent. and the mineral particles, because of their intimate contact and interaction, will, in a large measure, be self-sustaining, and therefore less liable to displacement and disintegration than in the usual macadam pavement where the

stone and other mineral constituents are arranged in layers of different sizes. He further claims that in such a pavement the traffic load will be carried for the most part by the mineral aggregate itself instead of by the bituminous binder, and therefore that greater stability and durability will be reached than is possible in sheet asphalt and similar pavements.

The specifications of the contract in question, the compliance with which it is claimed will be an infringement, are as follows:

"(5) The wearing surface shall have a thickness of two (2) inches after thorough compression with a roller.

### "Mineral Aggregate.

"(6) The mineral aggregate shall consist of a mixture of broken stone and sand, to which in some cases may be added a small quantity of stone dust or Portland cement.

"The stone shall be a crusher run varying in size from a maximum of one-half (½) inch, to the smallest particle retained on the finest mesh screen commonly used on crushing plants. For a two (2) inch wearing surface, the stone would vary in size from that passing a three-quarter (¾) inch screen, to as small as that held on a ten (10) mesh screen.

"The dust or fine screenings should be removed from the stone, as it usually is excessive and irregular in quantity and necessitates the use of a greater amount of cement.

"The sand shall be similar in character to that commonly used in sheet asphalt mixtures. It shall be hard-grained, moderately sharp, free from loam or other foreign material and varying in size from that passing a one-fourth (¼) inch screen to dust passing a 200 mesh screen. There shall not be over 5 per cent. passing the 200 mesh screen and there should not be over 30 per cent. held on the 10 mesh screen.

"The dust which may be added to the mixture shall be either a Portland cement or ground limestone. * * *

### "Proportions.

"(11) The proportions of the various ingredients composing the bituminous concrete shall be approximately three (3) parts of stone to two (2) parts of sand, to which shall be added from 7 per cent. to 10 per cent. by weight of the bitumen. If stone dust or Portland cement is added to the mixture, it shall be in such quantities that a screening of the whole aggregate shall not show more than 6 per cent. by weight passing a 200 mesh screen."

The sole question here to be determined is this: Under the evidence and the ruling of the Circuit Court of Appeals of this circuit, will the wearing surface of a pavement constructed in accordance with the above specifications be an infringement of complainant's patent? As said concerning the same patent by the Circuit Court for the Southern District of New York and affirmed by the Court of Appeals of the Second Circuit in the case of Warren Bros. Co. v. City of New York et al., 187 Fed. 831, 109 C. C. A. 591:

"The claims at issue are for a product, not a process. Of course the claims must be read in the light of the description, but it cannot be doubted that any one using the Warren pavement will infringe no matter how the pavement is produced. * * * We are dealing with a pavement, not the method of producing it."

In that case it was also decided that a pavement constructed of a 'crusher run" of stone "passing through a screen with a one-inch mesh" would constitute an infringement.

A somewhat persuasive factor in the determination of the question here presented is the fact that, a few months prior to the making of the present contract, this court, Judge Denison presiding, entered a consent decree in the case of Warren Bros. Co. v. City of Grand Rapids, John Kloots and Harry Vanderveen, declaring that the performance of a paving contract with specifications very similar to the present ones would necessarily be an infringement of the Warren patent. The specifications involved in that controversy were in part as follows:

"This wearing surface shall have a thickness of 2½ inches after thorough compression with a five (5) ton tandem roller.

"(2) The mineral aggregate shall consist of broken stone or broken stone and sand of a fairly uniform grading from the largest to the smallest particles in such proportions as to give the mixture a maximum degree of density and low percentage of voids. The maximum size of stone used may range from that passing a screen having circular openings three-fourths (¾) of an inch in diameter up to one and one-quarter (1¼) inches in diameter. Crusher run of stone between one (1) inch and screenings passing a one-fourth (¼) inch mesh may be used if found to be fairly evenly graded. Coarser stone when used shall be graded and remixed in proper portion. (The screenings passing one-fourth (¼) inch mesh screen may be used when the bitumen is refined coal tar or an asphalt not having a low ductility.) Coarse and fine sand having proper grading shall be added in such proportions as necessary to secure the dense aggregate specified above. Stone dust or hydraulic cement may be added as needed when the character of the bitumen used requires it."

The difference between the specifications last quoted and those involved in this controversy is more of phraseology than of substance. In the one a resultant product is described, while in the other the process of producing and the constituent elements of substantially the same product are described. Both call for substantially the same mineral elements graded in the same way, except that in the one maximum sized stone of 1¼ inches are to be used to construct a wearing surface 2½ inches in thickness, while in the other maximum sized stone of ¾ inch are to be used to construct a wearing surface 2 inches in thickness. The comparative difference in the maximum sizes of stone to be used thus appears to be slight. Under the evidence, it cannot be doubted that by following the process and complying with the requirements set forth in the one, the mineral aggregate having "a maximum degree of density and low percentage of voids" described in the other will be produced.

In one respect the counsel and witnesses for the respective parties differ radically in their interpretations of the contract specifications under consideration. On the part of the complainant the contention is made that the sizes, percentages, and grades of the mineral constituents of the pavement must be determined by tests with laboratory screens, while on the part of the defendants it is claimed that such determination must be made by tests with screens in actual operation in a stone-crushing plant. Defendants contend that their interpretation is both usual and feasible, while complainant contends that the specifications thus interpreted call for a product which is not only unusual, but commercially and practically impossible to obtain. The great weight of the evidence seems to sustain complainant's contention. However, it is unnecessary to decide this side issue. For, as

suming defendants' contention to be correct and viewing the evidence most favorably to them, the mineral aggregate produced by them, and which they claim will be used in the construction of the pavement, fairly falls within the claims of the patent. The tests made show conclusively that such a mineral aggregate, when thoroughly mixed and properly compacted, will have less than 21 per cent. of voids or the required density of the patented product. While such a mineral aggregate will not contain the inventor's preferred maximum sizes of stone, yet the evidence, which is at most but feebly contradicted, shows that it will contain the preferred proportions and the essential grades of sizes, and that it will have an useful degree of stability. Having the required elements of density and stability, the product must necessarily possess the "inherent stability" which is the broad and fundamental idea embodied in the invention and embraced in the patent.

A decree will be entered enjoining the defendants from carrying out their contract for the construction of the Barclay street pavement. Complainant will recover its costs to be taxed.