## LOS ANGELES LIME CO. et al. v. NYE.

### SAME v. CERIAT.

(Circuit Court of Appeals, Ninth Circuit. January 17, 1921. Rehearing Denied March 9, 1921.)

No. 3532.

1. **Patents ⬯244—Changing order of steps does not avoid infringement.**

Merely changing the order of steps designated in a patent does not avoid a charge of infringement, even in combination patents, unless the particular form, location, or sequence is essential to the result or novelty of the claim.

2. **Patents ⬯328—1,212,331 for manufacture of artificial travertin held valid and infringed.**

The Denivelle patent, No. 1,212,331, for process for the manufacture of artificial travertin, *held* valid and infringed.

3. **Patents ⬯75—Use of artificial travertin in railroad station not a "public use."**

The use of artificial travertin in a railroad station more than two years before applying for letters patent is not a "public use" which precludes issuing a patent, since a public use is entirely different from a use by the public.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Public Use.]

4. **Patents ⬯58—Parties asserting public use for two years prior to patent application have the burden of proof.**

In a patent infringement suit, defendants have the burden of showing that the patented article was in public use for two years prior to the patent application.

Appeals from the District Court of the United States for the Southern Division of the Southern District of California; Oscar A. Trippet, Judge.

Suits by Paul E. Denivelle and the Los Angeles Lime Company against C. L. Nye and against E. Ceriat, individually and doing business under the firm name and style of E. Ceriat & Co. Decrees for defendants, and plaintiffs appeal. Reversed and remanded, with instructions.

Chas. E. Townsend, of San Francisco, Cal., and A. P. Thomson, of Los Angeles, Cal., for appellants.

Ford & Bodkin, of Los Angeles, Cal., for appellees.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

ROSS, Circuit Judge. These suits were consolidated and tried as one in the court below, and were argued and submitted together here. From both suits the Lime Company was eliminated in the trial court.

The suits were for alleged infringements of a patent issued to Denivelle for the manufacture of artificial travertin, and the defense in each case was lack of invention, prior use, and noninfringement. The trial resulted in decrees dismissing the bills, with costs to the defendants thereto.

⬯For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

If the patent is valid and the alleged prior use not sustained, there can, we think, be no doubt that in each case there was clear infringement.

Travertin is a natural rock of Italy, concerning which the Century Dictionary says:

"It is a soft, porous, straw-colored rock, easily wrought when freshly quarried, and afterward hardening, and seeming, under the climate of Italy, to be very durable. The exterior walls of the Coliseum and of St. Peter's are built of this material."

In the patent, which was issued January 16, 1917, the patentee declares:

"This invention comprehends a process to be used in the manufacture of an artificial stone simulating travertin stone or marble and adapted to be used especially for its architectural and decorative surface effect.

"The embodiment of the invention may be considered in two aspects: (A) Representing the method as practiced for casting separate articles, such as columns, capitals, figures, etc., later to be set in place; (B) representing the method as practiced for surfacing and finishing structures already in place such as walls, cornices, etc.

"The first method embraces the application of colored plastic material or ingredients, such as Portland cement, plaster of paris, Keene's cement, magnesite and water or other liquid substance with or without aggregates to an upturned negative form, or mold of existing type, of wood, plaster, cement, etc., wherein these colored materials are so applied before the final set or crystallization of the mass, in a variety of progressive steps consecutively, as to produce in the cast or positive taken from said mold, form, etc., automatically as a result of the progressive steps and special application, a certain striated form of texture porousness in simulation of a stone known as 'travertin' or 'Roman travertin.' This process has to do mainly with producing or obtaining a surface especially desirable for reproducing in architectural and decorative effect; this method of use and effect being an innovation.

"The second method involves the use of the above colored materials in a certain definite and novel manner during their direct application to a wall or ceiling, or similar surface, and before the set or crystallization is complete, in order that the resulting surface may have a colored striated or porous surface in simulation of travertin or Roman travertin texture or stone of similar striated porousness; this form of use and effect being an innovation."

The present case involved the method as practiced for surfacing and finishing structures already in place, concerning which the patentee said in his specifications:

"In proceeding by process (B), as in the case of walls, ceilings, etc., already erected into position, I employ the following steps: The plastic materials or ingredients, such as Portland cement, Keene's cement, magnesite, plaster of paris, or a combination of the ingredients, are applied to walls or ceilings, interior or exterior, whereby the resulting surface obtains a striated porosity of the nature and for the purpose of producing a simulation or imitation of the surface that obtains in Roman travertin stone commonly known as 'travertin'; the object being to incorporate several or all of the following steps in accordance with the degree or perfection in imitation or simulation required in the finished surface from the architect's viewpoint:

"1. To a concrete, brick, metal or wood lath, or any similar form of construction B, one or two coats of plastic material or mortar, as 10, composed of plaster of paris, Portland cement, or Keene's cement and sand or aggregate, is applied and straightened to a fair surface. This application may be varied in method and result; the object being to form a foundation for the steps which follow.

"2. Next, a colored mixture, as *11*, composed of white Portland cement, Keene's cement, magnesite, plaster of paris, or similar materials, with or without a percentage of aggregate or sand added is reduced to a consistency of a soft paste in semiliquid form, by the addition of water or other agency, and applied to the wall in that state by means of a trowel, float or similar device to a varying thickness, in accordance with the depth of porosity required in the finished result. This application is immediately straightened roughly by means of a rule or straightedge. The foregoing coat *2* is for the purpose of producing a background coating of the general color form required, of sufficient thickness to permit of the next operation.

"3. One or several mixtures of different colors of the foregoing ingredients, or reduced with water or other liquid to a soft pasty consistency, is applied in a series of horizontal veins *12*, of varying length, with a narrow, long, soft brush, or other device immersed in the one or several colored mixtures successively and applied to the coating *11* of operation B2 above by stippling in while the material of coat *11* is very soft. A light horizontal trowel action is repeatedly applied. This is for the purpose of providing light, horizontally striated veins or lines of different colors or tones of color in the finished result.

"4. While the foregoing coats *11* and *12* are still very soft, a sharp stipple is produced to the full depth of coatings *11* and *12* by means of a slender or narrow brush of stiff bristles held horizontally and applied in a series of sharp jabs and pressure, said stippled jabs being placed staggered, with varying sequence between the colored veins *12* described heretofore.

"5. A light horizontal trowel application follows . This is for the purpose of producing the greater porosity in texture markings required in the finished result; the form and nature of the bristles producing a jagged series of depressions, horizontally striated formation, and the trowel's pressure reducing the width of these depressions, together with providing an undercut quality to the stippling it would not otherwise have.

"6. While the coating *11* is still soft, but in an advanced stage approaching set or crystallization, a smaller series of jabs is applied in a horizontal rotation by means of a stiff wire brush enough to penetrate the surface, gradually hardening, and applied between the grosser markings and veins described in operations B2 and B3. This is for the purpose of producing the refinements of texture or horizontal strata of porous quality not provided or possible by prior operations described.

"7. The surface mixture *11*, with its added veining mixture *12*, is now finished by the application of vigorous troweling. This is for the purpose of removing all imperfections or unevenness that may accrue during operations B2, B3, B4, B5, B6, and B7, and to leave a straight smooth surface of different color tones produced by the variegated striated veins and the shadows of the depressions, such as are characteristic of Roman travertin or stone commonly known as 'travertin.'

"8. In such moldings, cornices, panel moldings, or forms of ornamentation as may require it, the same methods are applied in forming the same as described in operations B2, B3, B4, B5, B6, and B7, except that following the last step a knife mold that has the form or outline of the object required will be used in addition to the foregoing methods of B2, B3, B4, B5, B6, and B7 and run over the surface of the object its full length to retain perfection of contour."

The claims alleged to be infringed are as follows:

"1. A process for the manufacture of striated artificial stone structures which comprises depositing upon a prepared surface of desired form a series of narrow layers of plastic material, depositing upon said layers and upon the exposed surfaces therebetween a suitable material of such texture and consistency as will leave numerous small portions of said exposed surfaces out of contact with said material, binding together said layers and said material with a fluid cement, and allowing the mass to set.

"2. A process for the manufacture of striated artificial stone structures which comprises depositing upon a prepared surface of desired form a series of

narrow layers of plastic material of a certain color, depositing upon said layers and upon the exposed surfaces therebetween a suitable material of a different color and of such texture and consistency as will leave numerous small portions of said exposed surfaces out of contact with said material, binding together said layers and said material with a fluid cement, and allowing the mass to set."

"5. A process for the manufacture of striated artificial stone structures, which consists in preparing a mold of suitable outline with an isolator, forming veins of plastic material over this prepared surface, depositing loose, lumpy material over the veining to provide pockets, binding the pocket-forming material with the veining material, and leaving certain pockets exposed on the surface adjacent to the mold surface."

"9. A cementitious structure suitable for decorative purposes comprising a mass of cementitious material at least one surface of which is shaped and striated and formed with small irregularly spaced depressions, the striæ constituting the exposed portions of shallow inlays of uniformly colored cement."

"10. A cementitious combination for decorative use such as a finish for exterior or interior building walls and ceilings, which combination is formed of differently toned thin layers or strata, the said layers only partly connected one to the other in such manner as to leave serrated voids in stratified formation between said layers, said layers and voids existing only adjacent to the surface, but giving an appearance, when erected, of extending through the depth of the mass, the resulting decorative surface simulating that of a natural stone structure of sedimentary origin."

[1] The view taken by the trial court respecting the question of infringement as stated in the record was that any change in the order of the steps as designated in the patent operated an avoidance of infringement; but we do not so understand the law.

In the thoroughly considered case of Tilghman v. Proctor, 102 U. S. 707, 26 L. Ed. 279 (overruling its previous decision in Mitchell v. Tilghman, 19 Wall. 287, 22 L. Ed. 125), the Supreme Court, after showing that the patent law extends to any new and useful art or manufacture, and that in a patent for a process the inventor is not required to point out all the forms of apparatus by which the process may be applied, having pointed out a particular method by which it could be practically and usefully applied, said, at pages 728 and 729 of 102 U. S. (26 L. Ed. 279), among other things:

"The mixing of certain substances together, or the heating of a substance to a certain temperature, is a process. If the mode of doing it, or the apparatus in or by which it may be done, is sufficiently obvious to suggest itself to a person skilled in the particular art, it is enough, in the patent, to point out the process to be performed, without giving supererogatory directions as to the apparatus or method to be employed. If the mode of applying the process is not obvious, then a description of a particular mode by which it may be applied is sufficient. There is, then, a description of the process and of one practical mode in which it may be applied. Perhaps the process is susceptible of being applied in many modes and by the use of many forms of apparatus. The inventor is not bound to describe them all in order to secure to himself the exclusive right to the process, if he is really its inventor or discoverer. But he must describe some particular mode, or some apparatus, by which the process can be applied with at least some beneficial result, in order to show that it is capable of being exhibited and performed in actual experience."

And upon the subject of infringement, at pages 730 and 731 of 102 U. S. (26 L. Ed. 279), proceeded as follows:

"It only remains that we should express our views on the question of infringement. The defendants advance several reasons for the purpose of

showing that their process does not conflict with that of Tilghman. First, because they do not use the apparatus described in the complainant's patent, but use a boiler in which the charge of fat and other materials is placed and heated, and do not mix the fat and water in the manner pointed out in the specification of the patent, but, on the contrary, have inserted in the boiler a pump which forces the water as it settles to the bottom upwards to the top of the mass and pours it upon the upper surface, whence it again finds its way down through the fat, thus keeping up a constant mixture. It is unnecessary to add anything further on the subject of the form of the apparatus used. The patentee is not confined to a metallic coil of pipe heated in a furnace; but his patent extends to and embraces any convenient vessel for holding the mixture, which is strong enough to sustain the pressure necessary to prevent the water from being converted into steam. The defendants use such a vessel, and use it for the purpose indicated and pointed out in the patent. The vessel which they use has the requisite strength to prevent the water from being converted into steam, and does effect that object. And as to the defendants' using a different method from that suggested in the patent for keeping up the mixture of fat and water, that is of no consequence. The keeping up of the mixture is the important thing. That is a necessary part of the process. They employ such a device for effecting this as is adapted to the form of vessel in which they heat the material. Using a boiler instead of a coil of pipe for this purpose, they are obliged to employ an additional or modified means for keeping up the mixture. They only employ such means as, in view of the change adopted in the form of the heating apparatus, and of the known appliances in use in analogous processes, would naturally suggest themselves to a mechanic skilled in the art. Or, if the mode of effecting the continued mixture adopted by the defendants should be deemed a new and useful improvement, they might perhaps have a patent for that peculiar device without being entitled to use Tilghman's process, on which it is but an improvement."

In Walker on Patents (3d Ed.) that case, as well as the decisions of the same court in Mowry v. Whitney, 14 Wall. 620, 20 L. Ed. 860, and Cochrane v. Deener, 94 U. S. 787, 24 L. Ed. 139, are referred to; and (sections 335, 336, 337, 338) he states the law to be that a patent for a process is infringed by one who, without ownership or license, uses substantially the process which the patent claims, identity, whether of apparatus or materials, not being necessary to constitute infringement, but that no process patent is infringed where any one of the series of acts which constitute the process is omitted, unless some equivalent act is substituted; reason seeming to indicate that one act is the equivalent of another when it works in substantially the same way to accomplish the same result.

In Hammerschlag Mfg. Co. v. Bancroft (C. C.) 32 Fed. 585, 589, where the reissued patent sued on was for a process for waxing paper in machinery, Judge Gresham said:

"One of the reasons urged against the identity of the two processes and against infringement of the fifth claim is that the defendant passes the paper under a roller submerged in a bath of paraffine, thus applying the wax on both surfaces of the paper and then passing it through two squeeze-rollers located over the vat. The defendant may not observe the same order in the various steps of the process that we find described in the reissued patent, but it does not follow that the processes are different because the various steps do not succeed each other in precisely the same order. The invention being for a process or an art, the inventor was not restricted to the particular means described in his patent for carrying out his process."

The case of Asbestos Shingle, Slate & Sheathing Co. et al. v. Rock Fiber Mfg. Co. (D. C.) 217 Fed. 66, was based upon a reissue patent for a process for producing artificial stone plates or slabs by mix-

ing asbestos fibers and hydraulic cement in a large bulk of water until the cement is reduced to a colloidal condition and a pulp is formed which can be worked in a cardboard machine, then pressing the same and allowing the material to set or harden, and also for the product of such process. The defendant's method of producing asbestos shingles did not embody the step of pressing the plates or layers of fibrous material other than such pressure as might be applied to them by the cardboard machine which formed the layers or plates, and it was therefore contended that they had omitted one of the steps of the claimed process and consequently did not infringe. In holding against that contention the court said:

"The object of the patent law is to protect the inventor, not in some paper ideal, but in his actual contribution to the useful arts. And here the contribution is of the highest order. This is not an improvement in an art; it is the foundation of a new art. No process of this kind, no manufacture like the complainant's, was known prior to Hatschek's time, and it is now known only by reason of Hatschek's genius and his disclosure to the world of the result of his labors. And so, while I realize that a strictly literal reading of claims 2, 3, 4, and 5 might lead to an enlargement of this defendant from the charge of infringement, yet I believe that, when the nature of this invention is borne in mind, when it is further remembered that, although a process claim is a description of the step by step means by which a particular result is achieved, yet it is possible for two steps to be taken concurrently instead of their always being required to go successively, the pressure specified in claims, 2, 3, 4, and 5 should be held to include not only that pressure which is given to the Hatschek pulp independently and subsequently to its treatment upon the accumulator roll, but that, inasmuch as for many practical purposes no pressure is needed beyond the pressure that is exerted by the rolls of the machine, the pressure mentioned in these claims 2, 3, 4, and 5 likewise covers the pressure that is exerted by the pressure means of the cardboard machine. This is true in spite of the fact that no new pressure means are added to those present in the old paper-making art, because the old means of pressure were not used to bring about the necessary new kind of pressure, the pressure having a result upon this Hatschek pulp which the pressure of the cardboard-making machines never wrought upon the paper pulp."

Even in combination patents a change in the form or the location or sequence of the elements of the patent will not avoid infringement where they are all employed to perform the same functions, unless form, location, or sequence is essential to the result or to the novelty of the claim. Adam v. Folger, 120 Fed. 260, 56 C. C. A. 540. See, also, Malignani v. Hill-Wright Electric Co. (C. C.) 177 Fed. 430; Rodman v. Deeds Commercial Laboratories (C. C. A.) 261 Fed. 190, 191; Pedersen v. Dundon, 220 Fed. 309, 136 C. C. A. 143; Bliss v. Spangler, 217 Fed. 399, 132 C. C. A. 210; Williams v. Kaufmann, 259 Fed. 859, 170 C. C. A. 659.

[2] That both the process and the product of the appellant were patentable we entertain no doubt. While the record shows that various kinds of artificial stone had been theretofore made, it is not pretended that before Denivelle's manufacture any artificial travertin had been successfully made.

It appears that the appellant, while endeavoring to induce the architects of the Pennsylvania Railroad Station in New York—McKim, Mead & White—to use in its construction a certain cement of which he

was the selling agent, was shown by Mr. Mead a piece of natural travertin and told in effect that if he could make a similar artificial stone they might consider its use. We insert the appellant's reply, as well as a little more of his testimony, which is uncontradicted:

" 'Well, Mr. Mead, I don't like to say that I cannot do it, but,' I said, 'this certainly does look like a stickler.' I said, 'How much time have I to experiment?' 'Oh,' he said, 'this won't be ready for consideration for six months.' He said, 'You have got six months to think it over.' 'Well,' I said, 'I will work on it, and when I have something good to show, why, I will see you again.' And the first piece of travertin, or so called, that I made, was a little piece about that long (indicating in the neighborhood of a foot long) and eight inches wide, and I showed it to him. It was very poor, in my estimation, as far as representing the natural was concerned, but nevertheless it showed a porosity of a certain character, and certain series of laminations, and I submitted that to him with apologies, and he said, 'Well, this is even better than I thought might be done.' 'Well,' I said, 'I am satisfied.' 'Oh,' he said, 'you may have made a sample, but' he said, 'could such a system be developed to really do any kind of work?' He said, 'Could you, through other minds, do it?' 'Well,' I said, 'invariably, Mr. Mead, in making experiments of that or any nature I always try to work along the line that I can produce the result by training others to do it.' And that was the evolution of it. We then discussed the plans, and he said, 'Well, let us assume that we may be able to do it, and could you show me on the plans where the natural should leave off and where the artificial should begin?' And we went over them and made mutual suggestions. The plans were then at a very incomplete state. And it simply arose out of the clear sky, really, because they could not afford to use natural travertin. As he explained it to me, it was Mr. McKim's dream to use natural Roman travertin on a big monumental building, and it had not been done, and they did not have money enough to do it. Now, that was the way the thing started. Later, I helped them by suggestions in drawing up specifications so that the Pennsylvania Railroad might receive bids, and these specifications were eventually whipped into shape, and the plans likewise, and it was placed in it."

The witness further testified that up to that time he had never heard of artificial travertin, although he had made other kinds of artificial stone, and that in his endeavor to make artificial travertin he practiced the process secretly, excluding from the shops any but his own employees, and that that was a part of his contract, and that when his work was completed, about the latter part of 1912, and in place, it continued to require supervision, and was not proved to be a success until its durability was established by reasonable time. The witness further testified that "the conditions—the materials were new, had never been used before," and that neither the architects nor the Pennsylvania Railroad were satisfied that the work would stand up, and that "it was regarded as an experiment from the very beginning."

The record shows that the appellant brought his process for making artificial travertin to the attention of the authorities of the San Francisco International Exposition December 12, 1912. At that time the appellant's process and product were not only in an experimental state according to his testimony, but is also shown by one of the exhibits in this case containing an article on the subject by the assistant director of works and chief of construction of the Exposition, Mr. A. H. Markwart, in which he says:

"But there was a difference between the use of a few tons of colored cement plaster cast blocks over the comparatively limited interior wall area in the

Pennsylvania Station and the use of a gypsum product on the wood-sheathed exterior area of all the buildings upon the Exposition grounds. When 25,000 to 30,000 tons of material were to be used, a widely different problem was presented. Experienced exposition contractors pronounced the textured and colored exterior as impossible of accomplishment, and many of the Western gypsum mills looked unfavorably upon the proposal, so for a time the artistic success of the Exposition was threatened by the attitude of both of these necessary factors. However, Mr. Denivelle, fortified with the knowledge obtained by the solution of a similar problem, believed that the Exposition plastic scheme might be made successful if the plaster manufacturers could be interested."

Denivelle was engaged and his work was done upon the Exposition buildings in the years 1913 and 1914, the result of which is thus spoken of in the article contained in the exhibit above referred to:

"Able critics have judged the exterior appearance of the entire Exposition from a color and texture standpoint to be one of great beauty. In adopting for the wall surfaces a treatment to give the effect of the famous Roman travertin, that peculiarly beautiful stone found near the River Tiber, there was, as far as expositions are concerned, a unique and original departure from the usual dazzling white plaster effects. ·

"Consequently the entire exterior of the Exposition, instead of suggesting plaster and stucco, conveyed an impression of rare marble, soft in tone and color, and the stratified texture of its surface produced repose for the eye by day and by night. It had no distinct, sharp color, but may be described as having several warm tones of gray and pink blended together, all an integral part of the mixture.

"While the architecture of the Exposition has many admirable features and has been the subject of favorable comment by all, it undoubtedly would not have created the impression which it did had it not been a color exposition. It must be conceded that the Exposition was interesting not only from the architectural viewpoint, but also from the texture and color of the exterior plaster."

We think nothing more need be said to show the novelty, as well as utility, of the appellant's process and product.

[3, 4] There remains for consideration the contention that both process and product were in public use more than two years before application for patent therefor was made. If that be true, the patent is, of course, conceded to be void, for such is the statute.

As the Exposition was not opened to the public until during the month of February, 1915, and the application upon which the patent was issued was filed October 20th of the same year, it is obvious that the alleged public use relied on by the appellees can relate only to the use of the process and product in the appellant's work on the Pennsylvania Railroad Station.

That "public use," within the meaning of the statute, is a very different thing from "use by the public," is well settled. In the leading case of Elizabeth v. Pavement Co., 97 U. S. 126, 24 L. Ed. 1000, known as the Nicholson Pavement Case, where the patented pavement had been in use on one of the streets of Boston for more than six years before application for the patent was filed, the Supreme Court, in discussing the subject, said, among other things:

"In this case it becomes important to inquire what is such a public use as will have the effect referred to. That the use of the pavement in question was public in one sense cannot be disputed. But can it be said that the in-

vention was in public use? The use of an invention by the inventor himself, or of any other person under his direction, by way of experiment, and in order to bring the invention to perfection, has never been regarded as such a use. Curtis, Patents, § 381; Shaw v. Cooper, 7 Pet. 292. * * * When the subject of invention is a machine, it may be tested and tried in a building, either with or without closed doors. In either case such use is not a public use, within the meaning of the statute, so long as the inventor is engaged, in good faith, in testing its operation. He may see cause to alter it and improve it, or not. His experiments will reveal the fact whether any and what alterations may be necessary. If durability is one of the qualities to be attained, a long period, perhaps years, may be necessary to enable the inventor to discover whether his purpose is accomplished. And though, during all that period, he may not find that any changes are necessary, yet he may be justly said to be using his machine only by way of experiment; and no one would say that such a use, pursued with a bona fide intent of testing the qualities of the machine, would be a public use, within the meaning of the statute. So long as he does not voluntarily allow others to make it and use it, and so long as it is not on sale for general use, he keeps the invention under his own control, and does not lose his title to a patent. * * * It is sometimes said that an inventor acquires an undue advantage over the public by delaying to take out a patent, inasmuch as he thereby preserves the monopoly to himself for a longer period than is allowed by the policy of the law; but this cannot be said with justice when the delay is occasioned by a bona fide effort to bring his invention to perfection, or to ascertain whether it will answer the purpose intended. His monopoly only continues for the allotted period in any event; and it is the interest of the public, as well as himself, that the invention should be perfect and properly tested, before a patent is granted for it. Any attempt to use it for a profit, and not by way of experiment, for a longer period than two years before the application, would deprive the inventor of his right to a patent."

See, also, Warren Bros. Co. v. City of Owosso, 166 Fed. 309, 317, 318, 92 C. C. A. 227; Pacific Cable Ry. Co. v. Butte City Street Ry. Co. (C. C.) 55 Fed. 760; Railway Register Mfg. Co. v. Broadway & Seventh Ave. (C. C.) 26 Fed. 536; Harmon et al. v. Struthers et al. (C. C.) 57 Fed. 637, and authorities cited in those cases.

We are of the opinion that neither the process nor product of the appellant were shown to have been in public use within the meaning of the statute for two years prior to the filing of his application for patent, the burden of showing which was upon the appellees. San Francisco Cornice Co. v. Beyrle, 195 Fed. 516, 115 C. C. A. 426, and cases there cited.

The decrees are reversed, and the cases remanded to the court below for further proceedings in accordance with the views above expressed.